Good morning, Your Honors. May it please the Court, my name is Roger Groteau. I represent the appellants in this case, the Hawatmeh family, in what is a very tragic case, quite obviously. It must be through the briefing that you'll be able to discover that. I would just say, Counsel, not to interrupt you at the beginning, but I think, and my colleagues can speak for themselves, but I believe that the entire panel agrees with you that this is a horribly tragic circumstance and case, and whatever the result of the legal issues, we certainly express our sympathy and condolences to everyone concerned. Thank you, Your Honor. The difficulty with this case is that the case turned tragic for a number of reasons, you know. As set forth in the briefing, of course, you know, we had the events that occurred in the apartment and then we had the subsequent hostage situation where Jason Bourne, the perpetrator of two murders and a substantial bodily injury, takes the child and puts the child in the Escalade in the parking lot. Well, obviously at that point in time, no one can deny there's a hostage situation, there's exigent circumstances going on everywhere with the 911 calls, but what happens after that is the problem for the case. It is the turning point, and the question is whether or not there is in fact a turning point or is it going to be linked to one single event, and the reason for that is the events occurred in the apartment at approximately 11 o'clock, maybe a little bit before 11 o'clock, at which point Jason Bourne takes a hostage, a live hostage. He gets on 911 call in the Escalade asking for a helicopter, means of egress, he's looking to escape, and he's got Joseph as a hostage. Joseph's a 12-year-old boy. He's just watched this event with the family go on, and Metro, I'm sorry, HPD's arriving at the property, they're focusing all their attention on the apartments and trying to locate Mr. Bourne, but eventually discover some minutes later, at approximately about 11, 18, and 47 seconds, they discover the Escalade in the parking lot, it's running, the lights are on, the brake lights are on, and they notice a boy and Mr. Bourne in the front seat. They've already been on property since 11.04, and from 11.07 in the morning, Mr. Bourne had been on a call with 911 operator for Henderson Police Department. And at that point in time, negotiators had been activated, SWAT was on its way, and Sergeant Clear at the time, now known as Smith, came upon the scene and then decided to, essentially in our view of the world, rush to judgment, so to speak. He'd already been in the car at that point in time, eight minutes, having conversations with 911. There was no brandishing of firearms at the officers. There was no threats made to the officers. And so do you agree that your success or failure in this case turns on whether the boy was seized or not?  Okay, so how do you deal with the Villanueva case? I think that the court made it clear that if somebody is just a passenger who is shot, even if they're aiming at the driver, there is a seizure. But the court goes on and talks about cases from many other jurisdictions distinguishing it from a hostage situation. So first, how do you deal with Villanueva? But second, do you have any case in which any court of appeals, ours or one of our sister circuits, has found a seizure in a case where it is the hostage who is shot, vice the passenger or a bystander? Obviously, there's many cases on a hostage being shot. Where it's been held to be a seizure. Understood, understood. Not under these facts. And that's the problem. These facts are different. And if I may, give me a moment just to set up the predicate. We all know, based on the briefing, that Sergeant Clear Smith gives the order to Officer Pendleton to take the shot if he can. One single shot, intended to be a headshot, intended to kill Jason Bourne and retire the problem. And free the child. The shot's taken. According to Officer Pendleton, he believed he had killed Jason Bourne. And we did that in a deposition. It's in the complaint. And he was certainly, at least from his determination, incapacitated. At which point, two seconds later, there is a 27-round volley of fire into the car, indiscriminately. And if we could show pictures, it's frankly obscene. The car has bullets. It was an Escalade with limousine-tinted windows. And after the shot being fired by Sergeant Clear, who's basically across from the front of the driver's door, with Pendleton being about 45 degrees to the driver's door, the shot was taken. There was no notice to anybody there not to shoot or to stand down that there was going to be a shot. Could I, and I want you to continue with the predicate in answering to Judge Bennett's question, if you can clarify, is there anything in the record that explains or suggests why that flurry of shots occurred? Short of contagious gunfire, Your Honor? No. Basically what happened is you had people, officers, that were behind the vehicle, some probably 70, 80 feet away. At the corner of a building, we had three officers there. There were several officers behind the vehicle and one to the left of the vehicle. They all just began shooting, literally. And at the end of the day, there were 27 rounds after the one shot that is alleged to have killed Jason Bourne in the motion to dismiss. Obviously, the facts are to be taken as true in a favorable reference to the moving party in this case, the plaintiff. But that's really the state of affairs. It shocks the conscience. I apologize. But I take it, as you were answering Judge Bennett, you weren't telling us of a case that involved a hostage situation where the victim of the hostage would be deemed seized by the government. And so what your argument seems to me to be is in that two second interval, the boy was no longer a hostage and there was a seizure there. And that's exactly what we've pledged in the complaint and argued. I mean, I'll just say that I'm a little skeptical of that argument just because Graham tells us, you know, in a reasonableness type inquiry. And I know it's a little bit of a different context here that we are not to question, you know, sit here in 20-20 hindsight and start to question the immediate and urgent actions in these situations. And so I'm having a hard time seeing how, in that small frame of time, someone could no longer be a hostage, you know, during this span of time. Can you speak to that? Absolutely. We believe that deliberate indifference is the standard to apply here in this case. And in this particular case, we believe that there was time for planning. That's the whole point. If you started the 911 calls at 11 o'clock in the morning, you have an ongoing dialogue that's been going on in another vignette, if you will, with HPD and 911 operator and marshalling services to get over there to the Stone Lake apartment complex. And then you have an officer on scene, which you would expect would be imputed with that knowledge, comes upon the vehicle when she is standing outside the vehicle and there's a conversation with 911 going on inside. And it's obviously my client's position, had they not rushed the vehicle, a negotiator or a SWAT could have resolved this and his child would still be alive. I mean, that's their opinion and I understand that. As to this question of a seizure, I was hoping you could speak to the Supreme Court's decision in Torres v. Madrid, in which they held, I'm quoting, that a seizure requires that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. And, I mean, I'm just wondering how that applies here because it seems like Joseph's freedom of movement, this was all initiated by Bourne and not by the officer. So how do we differentiate that here? I understand, Your Honor. The difficulty with this case, and we talk about case law, is the analogy goes to stopping cases, right? It goes to car chases and stopping cases. Well, it's not a car chase, but it's also a seizure of the vehicle, if you will. The vehicle was barricaded, couldn't be moved, couldn't go anywhere. They were seized inside the vehicle. And then the question is, if it's treated as a hostage, we don't seize the hostage, right? I mean, because the objective is generally of the officers to attempt to eradicate the threat to the hostage. But at the point where the conduct, and again, the difficulty here is the conduct shocks the conscience, if you think about it. I mean, and then defendants allege that, you know, the shooting of 27 rounds randomly into a car where you're hitting bumpers and windshields and with no likely, no great likelihood you're shooting Bourne is highly, highly outrageous. Because at the point they take a kill shot, there should have been a stand down. And at that moment in time, they used force to, well, to obviously eliminate Bourne as a threat. But after that, they shouldn't have shot. They shouldn't have had the contagious gunfire. I mean, there is a substantive due process argument here for the constitutional rights of Joseph at that point. So I guess really the argument is that after the initial initial shot that now it's the officers putting into place. Correct.  That is correct. But for those shots, Joseph would probably or could be still alive. So counsel, even if we were to accept that this could be a constitutional violation, notwithstanding Villanueva and notwithstanding the Supreme Court's determinations. What would have put other than at a high level of generality these officers on notice that continuing to fire at a car containing someone who they knew was a recent murderer and had been doing horrible things to the decedent? What would have put them on notice other than at a high level of generality that continuing to fire would be violating the constitutional rights of the boy? If Bourne was dead, Your Honor, there's significant case law that says you can't kill an innocent person who is unarmed. And in this particular case, Joseph was an innocent person and unarmed in the vehicle. And again, if taken as a whole, and again, I'm not going to try and suggest that we have to look beyond. But we have to see this as two events. You have the one shot. The one shot was intended to kill. Two seconds later, the rest of them. Respectfully, but had they not shot and they weren't supposed to shoot. And if you listen to Sergeant Clear, she starts screaming, stop, stop, stop. She also screams that after all the shooting occurs, someone asks her if everything's OK. And she said, we took a kill shot to the head. And I don't want to use the explicatives here, but she said, and then you guys just started shooting from behind. And what told the rest of the officers at that point that the first shot had killed Bourne? I mean, here's where it becomes plainly incompetent. As far as I'm concerned, my client, is that Sergeant Clear at the time should have notified the other 16 officers that were surrounding this vehicle that they were taking a kill shot. But if you don't prevail now, you'll have an opportunity in state court. Yes, Your Honor. Right now, the judge severed the case, obviously, and severed the state claims. We filed them in state law under the state law claims, as we've outlined in our briefing, of course. And those claims have stayed pending the outcome of this appeal, of course. May I retain the one minute and 15 seconds? We'll give you some additional time as well. Thank you very much, Your Honor. May it please the court. Craig Henderson on behalf of the defendants. And the defendants, as well as this panel, recognize the seriousness and the horrible nature of this case, and always have. And this appeal turns on the threshold Fourth Amendment legal question, however not the facts. The issue is whether Joseph was seized by any point by the Henderson officers. Under the Supreme Court's and this court's cases, the answer is a clear no. The officers neither acquired control over Joseph by show of authority nor applied force to Joseph with the intent to restrain him. The encounter the complaint describes is a hostage rescue effort. It was directed at neutralizing Bourne and freeing Joseph. Under these facts, there cannot be a seizure under the Fourth Amendment. Now, I could go into each element as to whether there was a show or whether the force seized him, but do you have any questions right now based upon your question of plaintiff that I can answer? Maybe you could just start at talking about whether there was sufficient time for the officers to contemplate anything after that first shot. Correct. And so what we know is that the gun was pointed towards Joseph's head and the shot was taken by Pendleton. Now, you have to look at Pendleton's deposition. He did say that he thought the shot was incapacitating, but he did say that Bourne continued to move. And the officers behind, who had seen a gun pointed at a child's head less than two seconds before, also fired. And so the intent of their firing was reasonable under the Fourth Amendment to attempt to liberate Joseph before Bourne pulled the trigger. And within two seconds, you know, the lag time, of course, that officers face and with what they saw within the vehicle, it would not be enough time to tell whether he was completely incapacitated. The case I would refer you to is Plumhoff v. Ricard, which is a Supreme Court case that was a car chase that resulted in a shooting, where the court said you don't need to stop shooting until the individual is clearly incapacitated or has surrendered. And here, based on Pendleton's testimony, he was still moving. He's Bourne. Bourne was still moving. Bourne had certainly not attempted to surrender. And so under Plumhoff, the shooting would still be reasonable. This circuit's case, I would say, is Monzon v. City of Murrieta, which said that 4.5 seconds was not enough time for an officer to determine whether someone was still a threat or not. So I would— Oh, I'm sorry. No, no, I'm just going to keep talking. No, I was going to ask, is there anything in the record that would suggest that the other officers knew that Officer Pendleton was given the green light to try to take the kill shot and end the situation? There's nothing in the record as it stands that says that those officers were behind the vehicle who saw the gun pointed to Joseph's head. So, for example, Sergeant Smith didn't communicate this over a radio that others could hear? Correct. Yes, there's nothing in the record that says that at this point for this case. But that would be a tactical error, and the other officers would still be valid under the Fourth Amendment, attempting to use deadly force against a suspect attempting to kill a child. And so it may be poor police practices in the allegation, or it may be a tactical error. But what you're looking at is the moment those officers fired, was there an immediate threat, which with the gun being pointed to Joseph's head is a clear yes. And so even if they had violated a policy or an order, their actions under the Fourth Amendment would still have been reasonable. And I take it you agree with the other circuit authorities that say that if someone is a hostage, they cannot be a hostage and at the same time be seized by the government for Fourth Amendment purposes? Correct. The issue there is who is exerting control over Joseph? And Joseph was in the vehicle not because of the police's actions. He was in there because of Bourne's. And even when he put his hands up at the police's command, Bourne re-established control over him when he pointed the gun at him, and he did not leave the vehicle because the commands were put your hands up and exit the vehicle. Joseph did raise his hands, but he didn't exit the vehicle because Bourne re-established control over him. And so the police were never the reason that Joseph remained in the vehicle. In fact, I think using the objective standards that we have to, an objectively reasonable person would be happy that police were there and happy to comply with their commands if they were indeed a hostage. And so there's no control. As I read the Supreme Court authorities, if there's no seizure, there's no Fourth Amendment claim. But there's still that still could give rise to a 14th Amendment, you know, deliberate indifference claim. And I know you dispute that that that the that that claim is established either. But do you agree with sort of that premise that if the Fourth Amendment isn't available, there might be recovery under the 14th Amendment, even in a hostage situation? I would agree in principle with that statement because the 14th Amendment is looking at not whether someone was seized, but whether the officer's action shocks the conscience. Right. So then moving to the facts of this case, this is clearly a purpose to harm case. It's not a deliberate indifference case. And looking at the 14th Amendment, because Bourne was obviously or, you know, was admittedly in the complaint pointing the gun at the child's head indiscriminately, making threats to kill him, telling him to open his mouth, threatening to do things to him that each second in this case was important, that it was changing and the officers were making decisions based upon those actions. And so for the purpose to harm standard to apply, there must be allegations in the complaint that the officers shot at Bourne, because there's no allegations they ever shot at Joseph, that they shot at Bourne for a reason unrelated to a legitimate law enforcement objective. And it is clearly a legitimate law enforcement objective to attempt to to release a hostage from his cap door. And so, again, irrespective of whether the tactics were flawed and irrespective of whether if the officers owed a duty of due care to Joseph and didn't have some sort of state court immunity that they could be liable under a theory of negligent or perhaps even grossly negligent conduct. Correct. There are state law claims that are still valid and pending. And we talked on Monday about the negligence claims here in Nevada, and I think this is a much better case to flesh those out. And they would be fleshed out in the state court. But I would point out on that that what the plaintiffs are advocating is that the officer should have stood down, retreated, and waited for SWAT to come. The analogy that comes to my mind is what the plaintiffs are requesting is this is a Uvalde situation, where officers go into a school where a hostage taker is contained in a room but with children. And they chose to stand down and wait for other resources. And that's the principle they're advocating is that officers stand down and allow Joseph to remain in the car unprotected while SWAT arrives. So they would be requesting that the court follow the Uvalde officers rather than officers that take action even though the decisions are incredibly difficult. The consequences can be horrific. But that officers take action and do their best to release the hostage from his camera. And although the officer's primary job, which I think they probably recognized, was vis-a-vis Joseph, they were in danger as well. Yeah, and the plaintiff stated, or Mr. Kurtil stated in his argument, Mr. Bourne never pointed a gun at the officers or threatened them. That's absolutely true. I don't think the officers ever—obviously they felt in danger that someone had a firearm and they were in the vicinity. But the attention of their force was always at liberating Joseph, which is important because when we deal with a lot of these cases, it's the officer that's saying he felt in danger subjectively. And that's what you're looking at. When officers are attempting to protect a person, a citizen, the analysis is slightly different in favor of the officer because they're trying to protect someone else, not themselves. And their subjective intent is never irrelevant but becomes less relevant. But I think the one thing that's also very clear in your questioning, Mr. Kurtil, is there is no clearly established law that would have put these officers on notice on either the Fourth or the Fourteenth Amendment claim that attempting to free a hostage could somehow subject them to a constitutional violation. The cases, in fact, are the opposite and completely support the officer's actions in this case. Any other questions from your honors? Thank you. Thank you very much. Counsel, we'll give you three minutes for rebuttal. Interesting comments from my colleague. The difficulty with this is this. This is different than a standard hostage case. You know, generally speaking, the hostage case, you've got the perpetrator, you've got the hostage. Someone tries to shoot the perpetrator and kills the hostage. That's predominantly these cases. This changes. This is different. In this particular case, forget only barricade policies that they didn't adhere to and so forth. That's part of their training that they didn't get and part of the Monell claims that we had. But the point here is that there was no thought process, no communication, no anything. There was simply a shot fired, didn't know the origin, didn't know the destination, didn't know where it went, didn't see it, heard a shot, and they lit the car up with 27 rounds. That's the problem. And it's in those rounds that this child died. And in those rounds, they shouldn't have been fired. That's the point. And we start talking about deliberate indifference. That is the standard that we're talking about here. It's difficult to get the seizure, and I'm going to candidly admit that. It's difficult to get the seizure, you know, based upon the case law. There is no case law in this kind of thing. There is seizure language that if I am chasing someone and they're driving at 100 miles an hour, I can shoot and kill. If they're driving at 10 miles an hour, I probably can't, or maybe five. You know, and that's the nature of these cases. It's whether or not the officers thought the general public was going to get hurt or they were going to get hurt. In this particular case, there was no brandishment whatsoever. We have 16 officers around this escalate. Okay, all with guns drawn, every single one of them. And you've got born in the front seat with the child in the passenger seat. He didn't threaten any of them with any gunfire. He didn't point the gun at them. Mr. Couture, can I ask, what makes you think that this two-second interval is enough to have deliberate, the ability to deliberate? Absolutely. And then what do you think is your best case to support that proposition? Well, here's the deliberate. Well, first off, we have testimony in the record, right, that is evidence, whether counsel discounts it or not. But Ray Wilkins was HPD's use of force officer, critical investigation team. He did the investigation in this case and came to those determinations. And he testifies to that under oath. And it's not an expert I hired. He is the one who did the report for HPD that says there was more than adequate time for deliberation. It already started. The problem in this case is it ended with the shootings in the apartment as a segment of this. An entirely different segment is he's trying to escape. And he takes a child. He doesn't harm that child. He takes him and he puts him in the seat. He calls 911, starts having a conversation with them. I want a helicopter. I want to get out of here. I need to leave. He's exhibiting some mental issues. And I get that there's quite a bit of time that happens during the course of this just awful 911 exchange. But what I'm speaking to is more the what sort of deliberation could there be from Pendleton to officers' firings? Again, you don't have the benefit of some of the things in this case, obviously, on the briefing, because this is a 12v6 motion. But what ends up happening is he's sitting in that parking lot. And these are the revelations that should, you would think, be an epiphany to who's on scene. But he'd been sitting there since the incident occurred. Didn't go anywhere. He didn't flee. He didn't go anywhere. He sat in the vehicle while they're running. He had plenty of time before they even arrived to get in that vehicle and drive away. Didn't do it. Hadn't killed the child. He killed everybody in the apartment in minutes. Why don't you conclude? I'm sorry. That's all right. But the indifference portion, the timing, they knew they had SWAT on the way. They knew they had a negotiator on the way. They forced this issue because they were coming up on him, all with firearms pointed at him through the front windshield. Had they backed up, give a pensive moment, take the stress off the situation, barricade the vehicle, prevent it from leaving, and let SWAT and the negotiators go to work, in consistency with the barricade policy of HPD, that they did not do. Thank you. Thank you. We thank counsel for their arguments. And the case just argued is submitted. Thank you, Your Honor.
judges: BENNETT, SANCHEZ, THOMAS